Filed 3/1/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KAHLIL AKHELLIE BYERS,<br><br>    Defendant and Appellant. | 2d Crim. No. B302061<br>(Super. Ct. No. 18CR03793)<br>(Santa Barbara County) |

Kahlil Akhellie Byers appeals from the judgment after the jury convicted him of kidnapping to commit rape, oral copulation, or sodomy (Pen. Code,[1] § 209, subd. (b)(1)), sodomy by use of force (§ 286, subd. (c)(2)(A)), and two counts of commercial burglary (§ 459), and found true allegations that he inflicted great bodily injury (§§ 667.61, subd. (d)(6), 1203.075, 12022.8), committed kidnapping for sexual purposes (§ 667.8, subd. (a)), and substantially increased the risk of harm of sodomy by kidnapping the victim (§ 667.61, subd. (d)(2)).  The court sentenced Byers to 17 years and eight months in state prison,

_____

[1] All subsequent undesignated statutory references are to the Penal Code.

followed by an indeterminate term of 32 years to life.

Byers contends the trial court: (1) abused its discretion when it admitted evidence he watched pornographic videos, (2) improperly refused to allow jury voir dire midtrial, and (3) erroneously instructed the jury regarding mental impairment of a witness. He further contends: (4) he received ineffective assistance of counsel, (5) cumulative errors require reversal, and (6) a great bodily injury enhancement was improper. We modify the great bodily injury enhancement and otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Early one morning at 2:18 a.m., Byers shattered the glass door of a shoe store, entered, and took merchandise. Twenty minutes later, he broke the display window of a pawn shop and took jewelry.

At approximately 3:40 a.m., Byers approached the victim, Jane Doe, who was homeless and sleeping outside. He woke her and said he wanted to "smoke something." Doe did not know Byers. She gathered her belongings and ran away.

Byers ran after Doe, grabbed her by the hair and wrists, and dragged her down an alley. He pinned her against a wall behind a trash dumpster and began assaulting her.

During the next hour, Byers repeatedly struck Doe's face. He touched her vagina with his penis. He forcibly penetrated her anus three times with his penis and finger.

Byers stopped his attack when a van entered a nearby parking lot. Byers and Doe ran away in different directions. She left behind her backpack and other belongings. In a 911 call minutes later, Doe said she was "beaten and raped [¶ . . . ¶] behind a dumpster off of Carrillo."

Byers returned to the homeless shelter where he was

2

staying at 5:51 a.m.  He was wearing Doe's backpack.  Later that morning, he texted and phoned a fellow resident of the shelter, C.F., to ask if police were searching his belongings.  Byers said he committed a "smash-and-grab" burglary the night before.  He showed C.F. a woman's wallet and keys and tried to sell them to him.

### *Investigation*

Surveillance video showed Doe being dragged down the alley and running away one hour, 39 minutes later.  Police found her bloodstained backpack containing her bank card under Byers's bunk at the homeless shelter.  Jeans in the backpack had Doe's driver's license in the pocket.  Her wallet and keys were in his locker.  Blood stains on his shirt contained DNA that matched Doe.  His right hand was swollen and bruised.

Doe's knees, neck, back, and left wrist were injured in the assault.  Her nose and cheek bone were fractured.  Her eyes were bruised and swollen, and blood was in her left eye.  She received approximately 25 sutures to repair lacerations to her lip and two sutures for her eye.

A Sexual Assault Response Team (SART) nurse examined Doe.  Doe described the assault, including being dragged by her wrists and hair and being forced to have oral and anal intercourse.  Because Doe's anus was so painful and swollen, the nurse was unable to swab far enough to recover specimens, but concluded that the physical examination was consistent with the history Doe gave.

A swab from Doe's left wrist matched Byers's DNA profile.  A small amount of male DNA was found in her perianal swab.

Near the dumpster, police found a bag belonging to

3

Doe, and socks and a hat stolen from the shoe store. Blood smears were found on the dumpster, and blood splatter on a wall behind it. Fluid at the crime scene contained Byers's DNA.

### *Pornography evidence*

On cross-examination, Byers testified he was "[n]ot into anal sex at all" and had "never been interested in anal sex." The prosecution then filed a motion to allow admission of evidence of oral and anal sex pornography accessed on Byers's phone. Byers opposed the motion. The court ruled that the search history from the day before and the day of the crime was admissible. The court ordered that a printout of the search history be sanitized to include only the time the videos were accessed and their general topics (e.g., "oral" or "anal") and excluded the titles of the videos. The court did not permit the jury to view the videos.

The court denied Byers's request to reopen voir dire and question the jurors about whether they had concerns about pornography. Before the evidence was introduced, the court read the jury an instruction that evidence of searches for, or views of, 67 pornographic videos on Byers's cell phone could be considered only if the prosecution proved by a preponderance of the evidence that he searched for or viewed the videos. The court instructed that the activity was not criminal, and could be considered only for limited purposes: to determine whether Byers acted with the intent or motive to commit kidnapping, sodomy, or oral copulation; whether he had a reasonable good faith belief that Doe consented; or to determine Byers's credibility. The instruction stated, "Do not conclude from this evidence that the defendant has bad character or is predisposed to commit crime. [¶] And if you conclude that the defendant committed these

4

searches as indicated, that conclusion is only one factor to consider, with all of the other evidence, and I want to emphasize it's not sufficient by itself to prove that the defendant is guilty . . . ."

The court then permitted the defense to call Byers out of order to ask him about the pornography. He admitted viewing pornography on his cell phone. He denied typing a search for combined anal and oral sex. He testified that he let others use his phone without monitoring them.

In rebuttal, the prosecutor presented evidence that in the hours before the incident, Byers texted three other women attempting to make plans with them, and viewed pornographic sites between the messages. The search for combined anal and oral sex appeared on his phone seven hours before the assault. The parties stipulated to admission of a printout with the times and general topics of the pornography sites.

The trial court repeated the jury instruction regarding pornography at the conclusion of the evidence. During closing argument, the prosecutor stated, "It's not a crime to look at pornography. [¶] This isn't about being against pornography at all." The prosecutor argued that the pornography contradicted Byers's claim that he did not plan on having sex with the victim, and showed "what he was looking for," and "what his intent was and his motive was."

## DISCUSSION

### *Admission of pornography evidence*

Byers contends that the trial court abused its discretion when it admitted evidence that he watched pornography shortly before committing the assault. We disagree.

We review a trial court's ruling admitting evidence

5

for abuse of discretion.  (*People v. Memro* (1995) 11 Cal.4th 786, 864.)  Possession of pornography is properly admitted when its relevance to motive or intent is not outweighed by undue prejudice.  (*Id.* at p. 865.)  In *Memro*, the defendant was charged with felony murder during commission of a lewd act on a child.  Our Supreme Court held that magazines and photographs of children in sexual poses were properly admitted as relevant to his motive and intent to perform lewd acts on the victim.  (*Id.* at p. 864.)  Although the evidence included material that "would undoubtedly be disturbing to most people," the court found the probative value outweighed the prejudicial effect.  (*Id.* at p. 865.)

Byers relies on *People v. McCurdy* (2014) 59 Cal.4th 1063 (*McCurdy*), which affirmed convictions for murder and kidnapping for the purpose of committing a lewd act on a child.  The trial court admitted the titles of adult-oriented magazines the defendant possessed that "focus[ed] on teenage women who were staged to appear younger than their actual ages."  (*Id.* at p. 1072.)  The trial court also admitted the titles of nine "adult-oriented videotapes" defendant had rented the day the victim was abducted as "relevant to demonstrate his interest or preoccupation with 'his sexual passions at the time in question.'"  (*Id.* at p. 1100.)  Our Supreme Court held the evidence was relevant to the defendant's intent and motive when he abducted the victim.  (*Id.* at p. 1102.)

The trial court here did not abuse its discretion.  Videos depicting oral and anal intercourse were relevant to Byers's motive and intent when he kidnapped Jane Doe.  They also impeached his testimony that he was not "into" or "interested in" the type of sexual contact the victim testified he committed.  The court went further than *McCurdy* to avoid undue

6

prejudice by allowing admission of only the topics and not the titles of the material, and by giving a limiting instruction before the evidence was admitted and again at the conclusion of the evidence.  We presume the jury followed this instruction.  (*People v. Davis* (2005) 36 Cal.4th 510, 537.)

That the evidence did not show that the videos depicted *forced* anal intercourse did not make them irrelevant. The lowest degree of similarity between a charged crime and uncharged misconduct evidence is required in order to establish relevance on the issue of intent.  (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)

We do not agree that the prosecutor's questions about Byers's interest in anal sex were an improper "trap" or "trick" to "set up" his impeachment.  The prosecution had the burden to prove that Byers kidnapped Doe with the intent to commit sodomy, oral copulation, rape, or sexual penetration.  (CALCRIM No. 1203, modified.)  Whether he had an interest in sodomy was thus a fair question.

This is not a case in which irrelevant or otherwise inadmissible evidence was introduced for the sole purpose of impeaching the credibility of the witness with contradictory evidence.  (Cf. *People v. Lavergne* (1971) 4 Cal.3d 735, 743-744 [witness asked where he obtained car in attempt to introduce evidence he stole it]; *Marocco v. Ford Motor Co.* (1970) 7 Cal.App.3d 84, 93-94 [evidence of vehicle defects unrelated to accident introduced to impeach discovery responses].)  Here, the questions regarding sodomy and the pornography evidence were relevant to Byers's motive and intent.

Nor did admission of pornography evidence violate Byers's right to due process.  "[T]he Due Process Clause

7

guarantees the fundamental elements of fairness in a criminal trial." (*Spencer v. State of Texas* (1967) 385 U.S. 554, 563-564.) *Spencer* held that evidence to the jury of prior convictions did not violate due process in light of state procedures to weigh the usefulness of the evidence against its prejudicial effect, the purpose of recidivist statutes, and limiting instructions to the jury. (*Id.* at pp. 562-563.)

Here too, the court weighed the probative value of the evidence against its prejudicial effect, admitted the evidence on relevant issues of motive and intent, and gave limiting jury instructions. (See *People v. Falsetta* (1999) 21 Cal.4th 903 [admission of propensity evidence of prior sex crimes did not violate due process].) This is not "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 232 [admission of "extremely inflammatory gang evidence" that had "no legitimate purpose" was not harmless and violated due process]; see *People v. Partida* (2005) 37 Cal.4th 428, 439 [improper admission of gang evidence did not render trial fundamentally unfair].)

### *Voir dire*

Byers contends that after the trial court ruled the pornography evidence admissible, it erred in refusing to reopen voir dire to inquire into the jurors' views on pornography. There was no error.

Reopening voir dire of seated jurors requires a showing of good cause; speculation that good cause exists is not sufficient. (*People v. Clark* (2011) 52 Cal.4th 856, 966 (*Clark*).) We review a trial court's decision whether to reopen voir dire for

abuse of discretion.  (*Ibid*.)

Here, Byers received pretrial discovery of the pornography evidence but did not request that jurors be questioned about it until after the prosecution presented its case-in-chief.  Byers has cited no authority for the proposition that a court may reopen voir dire during the presentation of evidence on a topic counsel had not contemplated during jury selection.  (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 314 [no right to reopen voir dire regarding racial bias after jury sworn].)  But any discretion the court may have had was not abused here.  Limitations on voir dire are not reversible unless "the resulting trial was rendered fundamentally unfair."  (*People v. Bell* (2019) 7 Cal.5th 70, 92.)  That did not occur here.

This case is not like *People v. Chapman* (1993) 15 Cal.App.4th 136, where the court denied a request to question prospective jurors whether they would harbor prejudice against the defendant based on his prior felony conviction.  There, the "failure to test the jury for impartiality . . . constituted an abuse of discretion" and violated the "Sixth Amendment right to an impartial jury."  (*Id*. at p. 141.)  But the request for voir dire in *Chapman* was made before jury selection was completed, not in the middle of trial.  *Chapman* is inapposite.

### *Jury instruction*

Byers contends there was insufficient evidence to warrant a jury instruction regarding evaluation of a witness with a mental or communication impairment.  We again disagree.

CALCRIM No. 331 tracks section 1127g, which requires an instruction, upon request, if a witness has "a developmental disability, or cognitive, mental, or communication impairment."  Byers agreed to the instruction regarding a

9

communication impairment based on Doe's speech impediment. But he objected to language regarding a developmental, cognitive, or metal disability.

The court modified CALCRIM No. 331 and instructed the jury that if it "determine[d] that a witness has a mental or communication impairment," it may "consider all of the factors surrounding that person's testimony, including his or her level of cognitive development." Even though the person "may perform differently as a witness . . . that does not mean he or she is any more or less credible than another witness. [¶] You should not discount or distrust the testimony of a person with a mental, or communication impairment, solely because he or she has such a disability or impairment."

"A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) "[T]here need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference." (*People v. Alexander* (2010) 49 Cal.4th 846, 921.)

The evidence here was sufficient to warrant the instruction. Some of Doe's statements in court were erratic. She refused at first to be sworn as a witness. When the prosecutor asked if she wanted to be called by her first name, she responded, "Is that a threat?" She testified that she did not want to be in court "[b]ecause this doesn't have anything to do with me, really. I guess I was a witness." She testified that after the preliminary hearing, "I think my PTSD was even worse. . . . I'd like to get better mentally."

In chambers, the prosecutor said Doe "has some

10

severe mental health problems, which I'm sure we can all tell just by her behavior and her demeanor." The trial court stated that Doe has "obviously got mental health issues." Near the end of the trial, the court stated, "just observing her behavior, I think her cognitive disabilities were fairly obvious."

Giving CALCRIM No. 331 did not lower the prosecution's burden of proof. The instruction does not ""unduly inflate the testimony"" of the witness. (*People v. Catley* (2007) 148 Cal.App.4th 500, 507 (*Catley*).) Instead, it advises the jury to consider the impairment with "all of the factors surrounding that person's testimony," and states that the impairment "does not mean he or she is any *more or less* credible than another witness." (CALCRIM No. 331, italics added.) A defendant "cannot complain of an instruction the necessary effect of which is to increase the likelihood of a fair result." (*Catley,* at p. 507.)

In *People v. Keeper* (2011) 192 Cal.App.4th 511, the Fourth District concluded that section 1127g applies only "to persons whose developmental disability, or cognitive, mental, or communication impairment, causes them to be dependent on others for care." (*Id.* at p. 521.) We do not read section 1127g as being so limited. The plain language of section 1127g applies to a witness with a "developmental disability, or cognitive, mental, or communication impairment," without limitation to dependent persons. *Keeper* relied on the statement of legislative intent to "protect[] the rights of developmentally disabled persons and other dependent persons who are witnesses in criminal cases." (Stats. 2004, ch. 823, § 1, quoted in *Keeper, supra,* 192 Cal.App.4th at p. 521.) But some sections of the legislation that added section 1127g do not involve, or are not limited to,

11

dependent persons.[2]

"CALCRIM No. 331 'provides sound and rational guidance to the jury in assessing the credibility of a class of witnesses as to whom "'traditional assumptions'" may previously have biased the factfinding process.'" (*Catley*, *supra*, 148 Cal.App.4th at p. 508.) This guidance is appropriate for witnesses whose impairments may affect their testimony, whether or not they are dependent on others.

The jurors were not instructed that Doe had a mental or communication impairment. Instead, they were to apply the instruction *if* they determined she had such an impairment. The trial judge noted that Doe's disabilities were "obvious" after observing her behavior in court. The jurors could consider their observations of her demeanor. (*Conservatorship of E.B.* (2020) 45 Cal.App.5th 986, 996, review granted June 24, 2020, S261812 [conservatorship jury trial finding grave disability]; *People v. Ghobrial* (2018) 5 Cal.5th 250, 269 [denial of competence hearing

---

[2] For example, one section of the legislation authorized courts to make reasonable accommodations for "adults and children with disabilities" who were victims of sexual offenses. (Stats. 2004, ch. 823, § 16, amending Pen. Code, § 1347.5, subds. (a) & (b).) For purposes of section 1347.5, "disability" was defined as "any mental or psychological disorder or condition . . . that limits a major life activity," i.e., that "makes the achievement of the major life activity difficult," or is included in the broader protections of the Americans with Disabilities Act. (§ 1347.5, subd. (a)(1), incorporating former Gov. Code, § 11135, subd. (c)(1) & (2) (Stats. 2003, ch. 784), which in turn incorporated former Gov. Code, § 12926, subds. (i)(1), (i)(1)(B) & (*l*) (Stats. 2003, ch. 164, § 1) (now subds. (j)(1), (j)(1)(B) & (n).) Dependency is not required.

based on judge's observations of defendant].)

And the instruction did not suggest that the jury could ignore other factors regarding Doe's credibility. "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."'" (*People v. Wilson* (1992) 3 Cal.4th 926, 943.) The jury was given standard instructions on assessing the credibility of witnesses. (CALCRIM Nos. 105 & 226, modified.) The jury was also instructed regarding evaluating conflicting evidence (CALCRIM No. 302) and prior statements of a witness (CALCRIM No. 318, modified). Taken together, the instructions did not mislead or confuse the jury. (*People v. Jaspar* (2002) 98 Cal.App.4th 99, 111.)

### Ineffective assistance of counsel

Byers contends that his attorney rendered ineffective assistance when he failed to object to evidence that he refused to answer questions by the SART nurse. We are not persuaded.

When police told Byers that a SART nurse would examine him pursuant to a search warrant, Byers disputed his obligation to be examined. The nurse testified without objection that he refused to answer her questions regarding his address, telephone number, and "hygiene information" regarding whether he urinated, defecated, showered, brushed his teeth, or changed clothes after the incident. She testified, "He didn't seem that he felt like he needed to—to cooperate with all—with everything that I was asking him."

On cross-examination, the nurse agreed that other than his address and hygiene questions, Byers answered all questions, including his date of birth, medical conditions, and recent injuries. She testified that he cooperated with her taking

13

his blood pressure, pulse, and temperature.  She agreed that she did not know he was homeless and it "would not be strange" for a homeless person to refuse to answer a question about their address.  Defense counsel asked if she knew if he had access to a place to bathe or conduct other hygiene activities, but the court sustained objections to those questions.

　　　　To establish ineffective assistance of counsel, defendant must show that "'counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms,'" and there is "'a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)  "'If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation.' [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.)  "An attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.)

　　　　Byers has not established ineffective assistance of counsel.  The jury already knew he did not want to be examined.  On cross-examination of the nurse, counsel suggested explanations for Byers refusing to answer questions including embarrassment at being homeless and lack of access to a bathroom.  Byers has not negated the possibility that counsel had a tactical reason to allow the evidence as a means to elicit sympathy for his homelessness.  There is no reasonable probability the outcome would have been different without the

14

evidence that Byers refused to answer some of the nurse's questions.

### *Cumulative prejudice*

Byers contends the combination of the asserted trial errors "created a negative synergistic effect" that deprived him of a fair trial. (*People v. Hill* (1998) 17 Cal.4th 800, 847.) Because we have rejected Byers's claims of error, "we likewise conclude that the cumulative effect of these asserted errors was not prejudicial and does not require reversal." (*People v. Bonilla* (2007) 41 Cal.4th 313, 360.)

### *Great bodily injury enhancement*

As to kidnapping (count 1), the court imposed a five-year great bodily injury enhancement (§ 12022.8). The parties agree that by its terms, section 12022.8 does not apply to kidnapping, and ask that it be replaced by the three-year enhancement for infliction of great bodily injury in the commission of any felony (§ 12022.7, subd. (a)). (*People v. Strickland* (1974) 11 Cal.3d 946, 961.) We accept their stipulation and order the judgment be modified accordingly.

### DISPOSITION

The judgment is modified as to count 1 to strike the five-year great bodily injury enhancement (§ 12022.8) and replace it with a three-year enhancement (§ 12022.7). The trial court is directed to prepare an amended abstract of judgment reflecting

15

the modification and to forward the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PUBLICATION.


TANGEMAN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

James E. Herman, Judge

Superior Court County of Santa Barbara

_____

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.